IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HOT SPRINGS DIVISION

DEANNA MILLER, individually and on
behalf of all others similarly situated                                         PLAINTIFF

v.                                          No. 6:14-CV-6074

CENTERFOLD ENTERTAINMENT CLUB, INC.;
and JESSIE ORRELL, individually and as officer
and/or director of Centerfold Entertainment Club                    DEFENDANTS

## OPINION AND ORDER

On July 17, 2017, the Court held a bench trial in this action and took the matter under advisement.  The Court heard testimony from Defendant Jessie Orrell, opt-in Plaintiff Michelle Johnson, opt-in Plaintiff Kristina Garton, Plaintiff Deanna Miller (collectively, "Plaintiffs"), and Diana Day.[1]  Several exhibits were also received into evidence.  After carefully considering the evidence at trial and the legal arguments made, and based upon observation of the witnesses and an opportunity to weigh their credibility, the Court now makes its findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.  For the reasons set forth below, the Court concludes that Plaintiffs were employees entitled to coverage under the Fair Labor Standards Act ("FLSA"), that Defendants violated the FLSA by not paying Plaintiffs a minimum wage, and that Plaintiffs are entitled to damages.

## I.      Procedural History

This case was originally filed on June 4, 2014 by Tamatrica Bonton.  The complaint alleged that while Ms. Bonton and others performed as exotic dancers for Defendants, they were not paid a minimum wage or overtime compensation in violation of the FLSA, 29 U.S.C. § 201, et. seq.,

---

[1] Ms. Day's deposition was taken under the name of Nichole Phillips, but she stated at trial that she prefers to be referred to as Ms. Day.

and the Arkansas Minimum Wage Act ("AMWA"), Ark. Code Ann. § 11-4-201, et. seq.  Ms. Miller filed notice of her consent to join on the next day.  (Doc. 5).  On October 9, 2014, the Court[2] granted conditional collective action certification of the FLSA class under 29 U.S.C. § 216(b) so that notice could be disseminated to potential plaintiffs.  (Doc. 12).  An amended complaint was then filed on November 20, 2014, adding Ms. Miller as a named Plaintiff with her own individual claims under the FLSA and AMWA.  (Doc. 17).  On May 19, 2015, the Court granted Rule 23 class certification on the AMWA claim.  (Doc. 37).  On September 17, 2015, the Court granted attorneys Josh Sanford and Josh West's motion (Doc. 44) to withdraw as counsel for Ms. Bonton, and the Court subsequently terminated Ms. Bonton's individual claims and converted her to an opt-in Plaintiff after it became apparent that she was no longer interested in pursuing her claims as a class representative.  (Doc. 57).  Ms. Garton and Ms. Johnson filed notices of their consent to join the collective action on December 15, 2015.  (Docs. 51, 52).  On December 28, 2015, the case was reassigned to the undersigned.  The Court sua sponte decertified the Rule 23 class action on March 10, 2017 (Doc. 64).  On July 17, 2017, a bench trial was held.  The Court heard evidence at trial for Ms. Miller, Ms. Garton, and Ms. Johnson.  Because Plaintiffs' counsel has withdrawn from representing Ms. Bonton, and she did not appear at trial to pursue her claims, Ms. Bonton's claims will be dismissed without prejudice as to their refiling.

## II.    Findings of Fact[3]

Mr. Orrell is the owner and sole shareholder of Centerfold Entertainment Club, Inc. (the "Club").  Defendants obtained and maintained a permit to operate the Club as a sexually-oriented business.  The Club is located in Hot Springs, Arkansas and provides adult entertainment in the

---

[2] Hon. Robert T. Dawson.
[3] Pursuant to Federal Rule of Civil Procedure 52(a), the Court finds the following facts to be established by a preponderance of the evidence.

form of exotic dancers.  Defendants also hired managers, waitresses, and doormen.  Ms. Miller, Ms. Garton, and Ms. Johnson performed as exotic dancers at the Club.  Ms. Miller performed at the Club as an exotic dancer from June 2011 until November 2012, except for approximately two months during her pregnancy.  Ms. Garton performed at the Club as an exotic dancer from August 2011 until July 2014, when she was fired for dancing at a private party.  Ms. Johnson performed at the Club as an exotic dancer from 2006 until June 2014.  She also worked at the Club as an assistant manager for approximately four months during that period.

As part of their job at the Club, Plaintiffs would perform dances on stage pursuant to a stage rotation, give personal dances to patrons called "lap dances," and spend time with patrons who purchased the dancer a "lady's drink."  Defendants had a stage rotation policy of requiring dancers to perform their stage dances for two songs.  Defendants set a policy that lap dances would cost $20 for one dance and $50 for three dances, and that ladies' drinks would cost $20.  Defendants required the dancers to pay the disc jockey ("DJ") ten percent of what the dancers made during stage dances.  For lap dances and ladies' drinks, Defendants required the dancers to evenly split proceeds with the Club.  Dancers were not allowed to handle any money other than their tips.  Plaintiffs did not receive any wages or other form of compensation from the Club for their work there.

When Plaintiffs performed stage dances, they would request certain songs from the DJ who would play those songs through a computer if they were available.  When the Club had Internet connection, the DJ would play songs through YouTube.  When Internet was unavailable, music would be chosen by the DJ from a play list, potentially streamed via iTunes or through a computer hard drive.  Defendants did not allow dancers to select rap music for their stage dances.

Dancers were subject to numerous fines if they did not comply with policies set by

Defendants.  Dancers would be fined for arriving late or leaving a shift early.  Dancers were required to wear shoes on stage, although Mr. Orrell would make exceptions to this rule. Defendants maintained a store at the Club from which dancers could purchase costumes or shoes, though dancers could also purchase costumes elsewhere.  While on stage, dancers were not allowed to go over the stage.  Dancers were not allowed to go outside in their costume.  Dancers could not leave the Club with a customer, and they were forbidden from dancing at other clubs or private parties.  The penalty for being caught outside with a customer was a $500 fine.  The penalty for dancing at another club or a private party was either termination or up to a $500 fine.

Decisions about the Club's facilities, interior décor and design, budget, and policies, all were made by Defendants.  Some dancers advertised their services over social media, but Defendants controlled all of the Club's advertising, including maintaining the Club's Facebook page and online job announcements.  Ms. Johnson would send text messages to regular customers to let them know when she was working at the Club.

All of the Club's managers were personally hired and supervised by Mr. Orrell.  He also maintained his own table at the Club.  While he previously supervised at the Club four to six nights a week, the frequency of his visits declined due to health concerns.  As a result of his health deteriorating, Mr. Orrell went to the Club approximately once every three weeks.  Nevertheless, Mr. Orrell installed live video surveillance at the Club so that he could supervise Club activities while at home.

Dancers were required to work a minimum of four days a week unless they had another job, in which case they were allowed to work a minimum of three days a week.  The Club was generally open Monday through Saturday every week.  Despite their record-keeping obligations, Defendants have no records as to the tenure, hours worked, or the amount of money in tips

4

collected by Plaintiffs during their time at the Club.

## III.    Discussion

### A.    FLSA Coverage

The Court must first determine whether there is FLSA coverage in the instant matter. The FLSA mandates that every employer pay each of his or her employees a minimum wage and overtime compensation for any workweek that the employees are (1) "engaged in commerce[4] or in the production of goods for commerce" (individual coverage) or (2) "employed in an enterprise engaged in commerce or in the production of goods for commerce" (enterprise coverage). 29 U.S.C. §§ 206(a), 207(a). Plaintiffs do not contend that enterprise coverage exists, but claim that individual coverage exists for each of them.

For individual coverage, "[t]he burden of proof lies on employees to establish that they were engaged in interstate commerce, or in the production of goods, and that such production was for interstate commerce." *Joseph v. Nichell's Caribbean Cuisine, Inc*., 862 F. Supp. 2d 1309, 1312 (S.D. Fla. 2012) (citations omitted). As evidence of individual coverage, Plaintiffs stated that they performed dances for customers who visited from outside the state of Arkansas, danced on furniture from outside the state, regularly handled beverages that came from outside the state, danced to music that originated from out of state, and wore costumes and stilettos that came from outside the state. The test "is not whether the employee's activities affect or indirectly relate to interstate commerce but whether they are actually in or so closely related to the movement of the commerce as to be a part of it." *McLeod v. Threlkeld*, 319 U.S. 491, 497 (1943). Plaintiffs' proffered activities are not closely enough related to interstate commerce for purposes of individual

---

[4] "'Commerce' means trade, commerce, transportation, transmission, or communication among the several States or between any State and any place outside thereof." 29 U.S.C. § 203(b).

coverage.  *See McLeod*, 319 U.S. 491 at 494 ("[H]andlers of goods for a wholesaler who moves them interstate on order or to meet the needs of specified customers are in commerce, while those employees who handle goods after acquisition by a merchant for general local disposition are not."); *Joseph*, 862 F. Supp. 2d at 1314 ("whether the customers Plaintiff served at Defendant's restaurant were local or from out-of-state is immaterial to establishing individual FLSA coverage).

Nevertheless, testimony elicited at trial confirms that individual coverage exists.  Plaintiffs were required to regularly use the Internet to perform their dances.  Individual coverage exists for dancers who "regularly use the instrumentalities of interstate commerce in [their] work."  *Thorne v. All Restoration Servs.*, 448 F.3d 1264, 1266 (11th Cir. 2006).  Furthermore, "[i]t is well-settled that '[t]he internet is an instrumentality of interstate commerce.'"  *Foster v. Gold & Silver Private Club, Inc*., 2015 WL 8489998, at *6 (W.D. Va. Dec. 9, 2015) (citing *United States v. Hornaday*, 392 F.3d 1306, 1311 (11th Cir. 2004); *AvePoint Inc. v. Power Tools, Inc.,* 981 F. Supp. 2d 496, 512 (W.D. Va. 2013).  When Plaintiffs performed stage dances, they would request songs from the DJ who would often stream the music over the Internet via YouTube.[5]  Whether on stage or providing a private dance, dancers are hired by the Club to dance, and music is an indispensable part of a dancer's work.  The music regularly streamed over the Internet while Plaintiffs performed at the Club, and their use of an instrumentality of interstate commerce is sufficient for individual coverage for each of the Plaintiffs in this action.

As an additional basis for individual coverage, Ms. Johnson regularly texted her clientele to let them know when she would be performing at the Club.  Individuals whose work involves

---

[5] Ms. Day testified that the music was played from a hard drive.  Having listened to her testimony on the stand and observed her demeanor in the process, the Court determines Ms. Day's testimony lacks credibility.  Earlier during trial, when asked whether Plaintiffs danced to music that originated from outside of Arkansas, Mr. Orrell testified that the music "[c]omes over the Internet."

the continued use of the interstate mails, telegraph, telephone or similar instrumentalities for communication across state lines are covered by the FLSA.  29 C.F.R. § 776.10(b); *Schmidt v. Peoples Tel. Union of Maryville, Mo*., 138 F.2d 13, 15 (8th Cir. 1943).  Testimony at trial also confirmed that some of the dancers advertised their services on social media.  While it is not clear whether Ms. Garton engaged in this activity,[6] Ms. Johnson also qualifies for individual coverage based on her use of a telephone to advertise her work at the Club.

### B.    Plaintiffs' Employment Status

Having found that FLSA coverage exists, the Court next considers whether Plaintiffs were employees of the Club.  The FLSA defines an employee as "any individual employed by an employer," and states that "employ" includes "to suffer or permit to work."  29 U.S.C. § 203(e)(1), (g).  The Supreme Court has interpreted "employ" under the FLSA to be defined with "striking breadth."  *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 326 (1992); *see also Hodgson v. Taylor*, 439 F.2d 288, 290 (8th Cir. 1971) ("The definition of employee under the Act is very broad and comprehensive.").  The Eleventh Circuit has described the statute's definition of an employee as the "the broadest definition [of employee] that has ever been included in any one act."  *Antenor v. D & S Farms*, 88 F.3d 925, 929 n.5 (11th Cir. 1996).

Courts typically employ the economic realities test to determine whether an individual is an employee under the FLSA.  *See, e.g., Whitworth v. French Quarter Partners, LLC*, 2014 WL 12594213, at *3 (W.D. Ark. June 30, 2014).  "In determining whether an entity functions as an individual's employer, courts generally look to the economic reality of the arrangement."  *Blair v. Wills,* 420 F.3d 823, 829 (8th Cir.2005) (citing *Goldberg v. Whitaker*, 366 U .S. 28, 33 (1961) ("[T]he 'economic reality' rather than 'technical concepts' is to be the test of employment")).

---

[6] Ms. Miller stated that she did not personally advertise her services.

Under this test, the Court looks "to the 'economic reality' of all of the circumstances concerning whether the putative employee is economically dependent upon the alleged employer." *Whitworth*, 2014 WL 12594213, at *3. Factors the Court will consider are: (i) the degree of control exercised by the Club over the business operations, (ii) the relative investments of the Club and dancers, (iii) the degree to which the dancers' opportunity for profit and loss is determined by the Club, (iv) the skill and initiative required by the dancers in performing the job, (v) the permanency of the work relationship, and (vi) the extent to which the work performed by the dancers is an integral part of the Club's business. *See, e.g., Harrell v. Diamond A Entm't, Inc.,* 992 F.Supp. 1343, 1348 (M.D. Fla. 1997); 51 A.L.R. Fed. 702, § 2.5 (collecting cases). "[T]he final and determinative question must be whether the total of the testing establishes the personnel are so dependent upon the business with which they are connected that they come within the protection of the FLSA or are sufficiently independent to lie outside its ambit." *Usery v. Pilgrim Equip. Co.*, 527 F.2d 1308, 1311-12 (5th Cir. 1976). If, after applying the six factors and viewing them in their totality, Plaintiffs have "shown that there is no doubt as to the relationship between the parties, the court may determine as a matter of law that the worker is an employee or independent contractor." *McFeeley v. Jackson St. Entm't, LLC*, 47 F. Supp. 3d 260, 268 (D. Md. 2014), *aff'd.* 825 F.3d 235 (4th Cir. 2016) (citations omitted).

### 1.    Degree of Control

In examining the degree of control exercised by the Club, the key inquiry is whether the dancer's "freedom to work when she wants and for whomever she wants reflects economic independence, or whether these freedoms merely mask the economic reality of dependence." *Harrell*, 992 F. Supp. at 1349 (citing *Reich v. Priba Corp.*, 890 F. Supp. 586, 592 (N.D. Tex. 1995)); *see also Mednick v. Albert Enters., Inc.*, 508 F.2d 297, 303 (5th Cir. 1975) ("An employer

cannot saddle a worker with the status of independent contractor, thereby relieving itself of its duties under the FLSA, by granting [her] some legal powers where the economic reality is that the worker is not and never has been independently in the business which the employer would have [her] operate"). The Court looks "not only at the [C]lub's rules and guidelines regarding the dancers' performances and behavior, but also to the [C]lub's control over the atmosphere and clientele'" *McFeeley*, 47 F. Supp. 3d at 268 (internal quotation and citation omitted). "An entertainer can be considered an independent contractor only if she exerts such a control over a meaningful part of the business that she stands as a separate economic entity." *Usery*, 527 F.2d at 1312-13.

The Court finds that the Club exerted a significant amount of control over business operations and that Plaintiffs were not separate economic entities. Plaintiffs had no authority to hire, fire, discipline, order goods, enter into contracts, set prices, or create policies—the Club retained this authority exclusively. Plaintiffs did not advertise for the Club, even though Ms. Johnson advertised her personal services to certain clients. Mr. Orrell installed video surveillance at the Club so that he could oversee Club activities even when he was not there. The Club required Plaintiffs to work four nights a week unless they had another job, in which case they were required to work three nights a week. The Club also required dancers to adhere to a stage rotation and overall routine. The dancers were required to wear shoes unless granted an exception from management, and the dancers were not allowed to handle money.

Additionally, the Club's authority to discipline its dancers (especially over their dancing elsewhere) is indicative of its control. The Club's exertion of control over its dancers includes "fining dancers for absences and tardiness; enforcing behavioral rules; setting minimum performance fees; and requiring dancers to sign in upon arrival." *McFeeley*, 47 F. Supp. 3d at 268

9

(citations omitted).  Here, the Club set the minimum fees for dances and drinks.  The Club imposed fines for dancers going over the stage, going outside with a customer, or for being late to a shift. If they were caught dancing at another club or a private party, dancers would either be terminated or face up to a $500 fine.   The penalty for being caught outside with a customer was a $500 fine. The penalty for dancing at another Club or a private party was either termination or up to a $500 fine.  That Ms. Garton was fired for dancing at a private party is strong evidence of the Club's control over business operations.  Due to the significant control exerted by the Club, the Court finds this factor weighs heavily in favor of Plaintiffs' being employees.

### 2.      The Relative Investments of the Parties

Mr. Orrell purchased the Club approximately 20 years ago for roughly $100,000, and he remains its sole shareholder and owner.  The Club also purchased and maintains a sexually-oriented business permit.  While the dancers are responsible for their own costumes and stilettos, this does not compare to the amount expended by Defendants in operating the Club.  Compared to the considerable investments of the Club, Plaintiffs' investments are relatively minor and indicative of their employment.  *See Reich v. Circle C. Investments, Inc*., 998 F.2d 324, 328 (5th Cir. 1993) (finding that a dancer's investments in costume and locks to pale in comparison to an employer that "owns the liquor license, owns the inventory of beverages and refreshments, leases fixtures for the nightclub (e.g., the stage and lights), owns sound equipment and music, maintains and renovates the facilities, and advertises extensively.").  This factor weighs in favor of Plaintiffs' being employees.

### 3.      The Dancers' Opportunity for Profit and Loss

The Court finds that the Club is "structured in such a way that the dancers will never have the same opportunity for profit as the owner of the business."  *Whitworth*, 2014 WL 12594213, at

*5. This is because "Plaintiffs have no ownership interest in the club, and they bear no risk of economic loss. The worst a dancer can do on any given night is to make no money if she receives no tips or dance fees."[7] *Id.* Furthermore, Defendants are responsible for the hours, location, advertising, management, maintenance, and aesthetics of the Club. Because of their significant role in bringing business into the Club, Defendants have a better opportunity for profit and loss. *Priba Corp.,* 890 F. Supp. at 593 ("[E]ntertainers do not control the key determinants of profit and loss of a successful enterprise."); *Clincy v. Galardi S. Enters., Inc.,* 808 F. Supp. 2d 1326, 1346 (N.D. Ga. 2011) ("Defendants are primarily responsible for attracting customers to the Club, as decisions about marketing and promotions for the Club, its location, its maintenance, aesthetics, and atmosphere, and food and alcohol availability and pricing are made by Defendants and/or their employees, not the entertainers."). This factor also weighs in favor of Plaintiffs' being employees.

### 4.   The Degree of Skill and Initiative Required by the Dancers

"Many other courts have previously found that little specialized skill is required to be a nude dancer," and this Court agrees.[8] *Thompson v. Linda And A., Inc.*, 779 F. Supp. 2d 139, 149 (D.D.C. 2011) (citations omitted). Dancers at the Club received no training, and the Club rarely turned down individuals who applied to be a dancer. As for initiative, the Court finds that a "dancer's initiative is essentially limited to decisions involving her costumes and dance routines." *Circle C. Investments, Inc.*, 998 F.2d at 328. This factor weighs in favor of Plaintiffs' being employees.

### 5.   Permanency of the Working Relationship

"The more permanent the [working] relationship, the more likely it is that a court will find

---

[7] Mr. Orrell confirmed at trial that the dancers do not share in the Club's profit and loss.
[8] While the Court has little doubt that some exotic dancers are quite skilled, Plaintiffs have demonstrated that the Club required only minimal skill from its dancers.

a worker to be an employee." *Thompson*, 779 F. Supp. 2d at 150.  While the exotic dancing profession is generally regarded as being a rather transient one, Plaintiffs in this case worked for the Club for extended periods of time.  Defendants argue that because dancers were allowed to also work elsewhere, the working relationship was impermanent.  However, "[t]hat dancers were free to work at other clubs or in other lines of work … [does] not distinguish them from countless workers in other areas of endeavor who are undeniably employees … for example, waiters, ushers, and bartenders." *Hart v. Rick's Cabaret Int'l, Inc.*, 967 F. Supp. 2d 901, 921 (S.D.N.Y. 2013).  Stated another way, "[e]ven if the freedom to work for multiple employers may provide something of a safety net, unless a worker possesses specialized and widely-demanded skills, that freedom is hardly the same as true economic independence." *McLaughlin v. Seafood, Inc.*, 861 F.2d 450, 452-53 (5th Cir. 1988).  As a result, courts tend to accord this factor limited weight.  *See Hart*, 967 F. Supp. 2d at 921.  Nevertheless, because each of the Plaintiffs worked the Club approximately between one and eight years, and they were still required to work three nights a week when they held  other employment, the Court holds that this factor also weighs in favor of Plaintiffs' being employees.

### 6.    The Extent to Which the Work is an Integral Part of the Business

There would be no entertainment for the Centerfold Entertainment Club without the exotic dancers.  *Id.*  (("No reasonable jury could conclude that exotic dancers were not integral to the success of a club that marketed itself as a club for exotic dancers.").  Just as with all of the other factors, this factor also favors employment.  The Court concludes that Plaintiffs were employees of the Club for purposes of the FLSA.

### C.    Mr. Orrell's Employer Status

Because the Court has found Plaintiffs to be employees, it must next determine whether

12

Defendants qualify as employers under the FLSA.  Defendant Centerfold Entertainment Club, Inc. is clearly an employer.  The primary issue is whether Mr. Orrell is also an employer under the FLSA.  Employer is defined under the statute as "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d).  "The Eighth Circuit has held that a corporate officer with operational control of the corporation's day-to-day functions is an employer within the meaning of the FLSA." *Simms v. Northport Health Servs. of Ark., L.L.C.*, 2013 WL 2102974 (W.D. Ark. May 14, 2013) (citing *Wirtz v. Pure Ice Co., Inc.*, 322 F.2d 259, 262-63 (8th Cir. 1963)).

The Court finds that Mr. Orrell is an employer under the FLSA because he had operational control of the Club's day-to-day functions.  Mr. Orrell owned a club called Bottoms Up prior to purchasing Centerfold Entertainment Club approximately 20 years ago.  He learned how to run the Club from friends and his own experience.   He remodeled the Club at his sole discretion and was the sole decision maker for decorating, maintenance, and the layout of the Club.  Mr. Orrell had his own table at the Club.  More recently, Mr. Orrell implemented an arm band policy at the club.  That Mr. Orrell had a security camera system installed at the Club so that he could oversee Club activities from his home is evidence of his operational control.  Mr. Orrell had sufficient control over the Club that he was an employer for FLSA purposes.

### D.       Statute of Limitations

Because Plaintiffs were employees of the Club and Defendants were their employers under the FLSA, Defendants violated the FLSA by failing to pay Plaintiffs any wages or other form of compensation for their work at the Club.  In order to determine what is now owed to Plaintiffs, the Court must first determine the applicable statute of limitations.  An FLSA cause of action "may be commenced within two years after the cause of action accrued … except that a cause of action

13

arising out of a willful violation may be commenced within three years after the cause of action accrued." 29 U.S.C. § 255(a).

A "willful" violation is one where "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." *Jarrett v. ERC Properties, Inc.*, 211 F.3d 1078, 1082 (8th Cir. 2000) (quoting *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988)). "Reckless disregard of the requirements of the [FLSA] means failure to make adequate inquiry into whether conduct is in compliance with the Act." 5 C.F.R. § 551.104. The willfulness standard requires more than mere negligence or a "good-faith but incorrect assumption that a pay plan complied with the FLSA." *Richland Shoe,* 486 U.S. at 135. The employees bear the burden of establishing willfulness. *Fenton v. Farmers Ins. Exch.*, 663 F.Supp.2d 718, 728 (D. Minn. 2009).

The Court finds that Defendants' violation of the FLSA was willful. This decision is informed by the Club's failure to keep any records regarding Plaintiffs' tenure at the Club, the hours they worked during any given week, or the amount of money in tips the dancers received while working. Additionally, Defendants never informed Plaintiffs of any of the provisions of minimum wage laws. Having listened to Mr. Orrell's testimony and observing his demeanor at trial, the Court concludes that the Club's purpose in failing to keep records and inform dancers of the relevant wage laws was to willfully violate the FLSA. As a result, the limitations period for each Plaintiff is three years.

Defense counsel argued at trial that this case was never properly commenced and Plaintiffs' claims are barred by the statute of limitations because Ms. Miller only filed a consent to join form (Doc. 5) before the filing of the amended complaint (Doc. 17) whereby she became a named Plaintiff. Defendants contend that Ms. Miller—as the only remaining named Plaintiff—also

needed to file a consent to join form after the filing of the amended complaint and within the limitations period.  Typically, the statute of limitations for each Plaintiff in an FLSA collective action runs when he or she files written consent with the court effectively joining the lawsuit rather than when the named Plaintiff files the complaint.  29 U.S.C. § 256(b).  The section of the FLSA relating to collective actions reiterates that "[n]o employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought." § 216(b).  Thus, it is clear that a suit does not commence for limitations purposes until a consent is filed.  Defendants are correct that this also applies to a named Plaintiff.  *See Acosta v. Tyson Foods, Inc*., 800 F.3d 468, 472 (8th Cir. 2015) (because the complaint alleged an FLSA collective action, the named plaintiff "was required to file a written consent to proceed as a party plaintiff," and his failure to do so should have resulted in dismissal of the FLSA claim); *Gomez v. Tyson Foods, Inc*., 799 F.3d 1192, 1194 (8th Cir. 2015) (same).

Here, though, both Ms. Miller's original consent filed before the amended complaint and her declaration filed right after the amended complaint are sufficient.  First, that Ms. Miller filed her consent while she was not a named Plaintiff and before the filing of the amended complaint does not prevent her from meeting the requirements of § 256(b).  *See Aaron v. City of Wichita, Kan*., 1993 WL 93337, at *7 (D. Kan. Mar. 9, 1993) ("The date for recalculation for any plaintiff *who did not file a consent with the original complaint* is the day his or her opt-in consent was filed with the court.") (emphasis added) (reversed on other grounds).  Second, Ms. Miller's signed declaration filed in support of Plaintiffs' first motion for Rule 23 class certification clearly sets forth her status as a named Plaintiff in this case and describes the basis for her wage claim. (Doc. 18-1).  This declaration indicates Ms. Miller's consent to proceed as a named Plaintiff in the

15

FLSA collective action and also meets the requirements of § 256(b).[9]   *See, e.g., Butler v. DirectSAT USA, LLC*, 55 F. Supp. 3d 793, 800 (D. Md. 2014) (finding a declaration in support of conditional certification sufficient to constitute written consent, in line with other courts that have required "only that the signed document verify the complaint, indicate a desire to have legal action taken to protect the party's rights, or state a desire to become a party plaintiff") (citing cases); *Callari v. Blackman Plumbing Supply, Inc.*, 988 F. Supp. 2d 261, 281–82 (E.D.N.Y. 2013) ("[C]ourts have generally not taken a strict approach with regard to the *form* of the written consent, at least with respect to named plaintiffs," and a filed declaration in which "the Plaintiff clearly identifies himself as the named Plaintiff in this action" is sufficient.) (citations omitted); *Lee v. Vance Exec. Prot., Inc.,* 7 F. App'x 160, 166-67 (4th Cir. 2001), 2001 WL 108760, at *6 ("The purpose of the consent forms is 'to make ... uncertain plaintiffs certain, and actual participants, so that defendants could know the parties and the charges with which they were to be faced.") (quotation and citation omitted).

Ms. Miller filed notice of her consent to join on June 5, 2014.  (Doc. 5).  Ms. Garton and Ms. Johnson filed notices of their consent to join the collective action on December 15, 2015. (Docs. 51, 52).  Under Federal Rule of Civil Procedure 15(c)(1)(B), an amended pleading "relates back" to the date of the original pleading when the amendment asserts a claim or defense that "arose out of the conduct, transaction, or occurrence set out ... in the original pleading."  Because the amended complaint asserts individual FLSA and AMWA claims by Ms. Miller against the Club, the amended pleading relates back as to her, for limitations purposes, to the date of her original consent to join on June 5, 2014.  For opt-in Plaintiffs Ms. Garton and Ms. Johnson,

---

[9] The Court will use the earlier date, that of Ms. Miller's notice of her consent to join (Doc. 5), for calculating damages.

their subsequently filed consents do not relate back because their FLSA actions commenced "on the subsequent date on which [their] written consent [was] filed in the court." § 256(b); *see also Lee v. Vance Exec. Prot., Inc.,* 7 Fed. App'x 160, 167 (4th Cir. 2001) ("In other words, consents not filed with the complaint do not relate back.").

### E. AMWA Coverage

Plaintiffs have also asserted claims under the AMWA based on the same conduct. Apart from the AMWA's more relaxed provisions related to coverage, "[t]he FLSA and the AMWA impose similar minimum wage and overtime requirements on employers and, in cases involving claims brought under both acts, the courts have concluded that their parallel provisions should be interpreted in the same manner." *Carter v. Primary Home Care of Hot Springs, Inc*., 2015 WL 11120563, at *2 (W.D. Ark. May 14, 2015). For the same reasons set forth above, the Court finds that Plaintiffs are employees and Defendants are employers under the AMWA, and that Defendants violated the AMWA by failing to pay Plaintiffs a minimum wage. However, there can be no double recovery. Because the federal minimum wage was higher than the Arkansas minimum wage for all periods relevant to this lawsuit, damages will be calculated based solely on the federal minimum wage claims under the FLSA.

### F. Tip Credit

Defendants have not argued for a tip credit to reduce the damages awarded to each Plaintiff, and the Court will not allow one. In order to qualify for a tip credit of up to fifty percent of the minimum wage requirements, (1) the employer must inform the tipped employees of the provisions of 29 U.S.C. § 203(m); and (2) tipped employees must retain all the tips they receive except those tips included in a tipping pool among employees who customarily receive tips. *See Priba Corp.*, 890 F. Supp. at 595. Defendants bear the burden of proving they are entitled to the tip credit.

*Pedigo v. Austin Rumba, Inc.*, 722 F. Supp. 2d 714, 722 (W.D. Tex. 2010).  Because that burden has not been satisfied, there will not be a tip credit to the damages awarded.

### G.      Damages

Plaintiffs will be awarded back wages for a temporal period extending three years preceding the filing of their consents to join during which they were employed by the Club.  During this period, the federal minimum wage was $7.25 per hour.  Plaintiffs are also entitled to liquidated damages in an amount equal to the back pay awarded because the Club has not met its burden of showing that it acted in good faith and had reasonable grounds for believing its actions were not in violation of the FLSA.  *See* 29 U.S.C. §§ 216 & 260; *Braswell v. City of El Dorado,* 187 F.3d 954, 957 (8th Cir. 1999) (An award of liquidated damages "is mandatory unless the employer can show good faith and reasonable grounds for believing that it was not in violation of the FLSA.").

Further, where, as here, "an employer has not kept adequate records of wages and hours, its employees cannot be penalized by being denied a recovery of back wages on the ground that the precise extent of their uncompensated work cannot be proved."  *Dole v. Alamo Found.*, 915 F.2d 349, 351 (8th Cir. 1990).  "Rather, the employees are to be awarded compensation on the most accurate basis possible."  *Id.* (citing *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687-88 (1946)).  Plaintiffs bear the burden of proving the extent of back wages to which they are entitled, but they may satisfy that burden by "just and reasonable inference."  *Anderson*, 328 U.S. at 687-88.  "The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence."  *Id.*  Plaintiffs have adequately estimated the relevant time periods in which they were employed by the Club and have given an average number of hours they worked in a week during that period.  However, Defendants have somewhat-successfully shown

that these estimates are unreasonable, so the Court will award each Plaintiff the amounts listed below.

### 1.  Deanna Miller

Ms. Miller testified that she estimates she was employed by the Club from June 5, 2011 until January 1, 2012, and again from March 1, 2012 until November 1, 2012.  She claims to have worked four days a week during her employment at the Club, at an average of 34 hours a week.[10] During this time, though, Ms. Miller also worked at Vision's and Paper Moon, two other entertainment clubs.  She also worked at other clubs while on vacation or while traveling, which Ms. Miller testified was not often.  She would also miss work, but claims to have made up the majority of missed time.  Additionally, the Club would not open on rare occasions.  Calling into question Ms. Miller's credibility, Defendants pointed out at trial that she previously fabricated a medical letter that was presented in the Hot Springs District Court to avoid punishment while she was on probation, and that she was also untruthful in her deposition about participating in other lawsuits.  Given Ms. Miller's concurrent employment at two other entertainment clubs that would presumably operate during the same hours, her unaccounted-for missed time, and valid questions about her credibility, the Court determines that her estimation is unreasonable.

Ms. Miller was required to work at the Club three nights a week, but the Court does not believe she worked any more than that given that she also worked at Vision's and Paper Moon during the same period, presumably those clubs operating during the same hours.  As a result, the Court will reduce her hours worked per week from the estimated 34 to 18, representing three days

---

[10] The Court also heard testimony from Ms. Day on the issue of damages, and she testified that the average number of hours worked by each Plaintiff in a given week was significantly less than what Plaintiffs report.  Ms. Day was not a credible witness, and her testimony on this matter provides no assistance to the Court in determining the hours worked by each Plaintiff.

a week of six hour shifts.  The Court determines that the Club was likely open an average of six hours a night during the relevant time periods.  Additionally, the Court will reduce Ms. Miller's 65 total weeks of employment to 60 weeks in order to account for missed time from work, including travel and dates that the Club did not open.  Ms. Miller's 18 hours per week is multiplied by the federal minimum wage of $7.25 for 60 total weeks of employment.  Ms. Miller is entitled to back wages in the amount of $7,830.00, plus an additional $7,830.00 in liquidated damages.

### 2.    Kristina Garton

Ms. Garton testified that she estimates she was employed by the Club from August 8, 2011 until July 3, 2014.  However, because her consent to join was not filed until December 15, 2015, the relevant period of employment for Ms. Garton is from December 15, 2012 until July 3, 2014. She claims to have worked 48 hours a week during approximately the first eight months of this period, which would entitle her to overtime compensation as well.  From August 9, 2013 until July 3, 2014, Ms. Garton claims to have worked 40 hours a week.  Thus, Ms. Garton claims to have worked either five or six days a week for the entirety of her employment, and the Club was only open six days a week.  Within that period, though, there were rare occasions in which the Club would not open, Ms. Garton would miss work on certain days, and she also cleaned houses during this same time period.  Calling into question Ms. Garton's credibility, Defendants pointed out that she receives public assistance in the form of ARKids First but also claims to have made roughly $52,000 a year as an exotic dancer because of how much she worked.  Because of the valid questions about Ms. Garton's credibility and her unaccounted-for missed time, the Court determines that her estimation is unreasonable.

The Court finds that Ms. Garton likely worked at the Club four nights a week, with an estimated six hour shift each night.  As a result, the Court will reduce her hours worked per week

and finds that a more reasonable estimation is 24 hours a week for the relevant time period. Additionally, the Court will reduce her 80.7 total weeks of employment by four weeks, to account for missed time from work, including time traveling and dates that the Club did not open.  Ms. Garton's 24 hours per week is multiplied by $7.25 for 76.7 total weeks of employment.  Ms. Garton is entitled to back wages in the amount of $13,345.80, plus an additional $13,345.80 in liquidated damages.

### 3.    Michelle Johnson

Ms. Johnson testified that she estimates she was employed by the Club from sometime in 2006 until July 31, 2014.  However, because her consent to join was also not filed until December 15, 2015, the relevant period of employment for Ms. Miller is from December 15, 2012 until July 31, 2014.  Ms. Johnson claims to have worked for the Club an average of 40 hours per week during this time.  Yet, Ms. Johnson worked numerous other jobs while she was employed at Centerfold. She testified that she worked as many as two or three full-time jobs at one time.  She would also take a couple of weeks of vacation each year and missed days on occasion when she was sick. Because of her other jobs—including full-time work—and missed time for vacation or sick days, the Court finds that Ms. Johnson's estimate is not reasonable.  Thus, the Court will reduce her hours worked per week and total weeks worked during the relevant time period.

The Court finds that Ms. Johnson likely worked at the Club four nights a week, with an estimated six hour shift each night.  This more accurately accounts for her numerous other jobs, while still recognizing Ms. Johnson's experience and value to the Club with her established customer base.  The Court will also reduce time from her estimated total weeks of employment to account for vacation and sick days, but because the Court found her to be the most credible among the Plaintiffs, the reduction will be three weeks from her estimated 84.7 weeks of employment.

21

This 24 hours per week is multiplied by $7.25 for 81.7 weeks of employment, equaling back wages in an amount of $14,215.80 plus an additional $14,215.80 in liquidated damages.

## IV.    Conclusion

IT IS THEREFORE ORDERED that Plaintiffs qualify for coverage under the FLSA, Plaintiffs were employees and Defendants were employers under the FLSA, and that Defendants willfully violated the FLSA by not paying Plaintiffs a minimum wage for their employment.

IT IS FURTHER ORDERED that Plaintiffs qualify for coverage under the AMWA, Plaintiffs were employees and Defendants were employers under the AMWA, and that Defendants violated the AMWA when they failed to pay Plaintiffs a minimum wage for their employment. However, no double recovery will be awarded, so Plaintiffs' damages will be based solely on violations of the FLSA for back wages plus liquidated damages.

IT IS FURTHER ORDERED that Defendants Centerfold Entertainment Club, Inc. and Jessie Orrell are jointly and severally liable to Plaintiff Deanna Miller in the amount of $15,660.00; to Plaintiff Kristina Garton in the amount of $26,691.60; and to Plaintiff Michelle Johnson in the amount of $28,431.60.

IT IS FURTHER ORDERED that opt-in Plaintiff Tamatrica Bonton's claims are DISMISSED WITHOUT PREJUDICE to their refiling.

Plaintiffs are DIRECTED to file any motion for attorneys' fees by August 18, 2017. Defendants will thereafter have until August 28, 2017 to respond.

IT IS SO ORDERED this 9th day of August, 2017.

/s/ P. K. Holmes, III
P.K. HOLMES, III
CHIEF U.S. DISTRICT JUDGE